**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


KELLY EVONNE AMELIA DOYCHAK,  )
                                        )
            Plaintiff,           )
                                          )
            v.                   )         02:12-cv-1645
                                          )
CAROLYN W. COLVIN,[1]         )
ACTING COMMISSIONER OF      )
SOCIAL SECURITY,             )
                                          )
            Defendant.     )

## MEMORANDUM OPINION AND ORDER OF COURT

September 4th, 2013

## I.      Introduction

Kelly Evonne Amelia Doychak ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") which denied her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"), respectively. This matter comes before the Court on cross motions for summary judgment. (ECF Nos. 9, 11). The record has been thoroughly developed at the administrative level. Accordingly, the matter is ripe for disposition. For the following reasons, the decision of the Administrative Law Judge ("ALJ") will be vacated and the case remanded for further consideration.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 24(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue, as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## II.     Procedural History

Plaintiff filed applications for DIB and SSI with the Social Security Administration on September 30, 2009, and September 2, 2009, respectively, originally alleging disability since December 30, 2006, because of endometriosis, intestinal cystitis, panic attack/anxiety disorder, diverticulitis, severe hearing loss, Barrett's esophagus, loss of control of right hand and arm, constant chronic pain, and spasms in pelvic region.  (R. 124-29, 138).[2]  Her alleged onset date was subsequently amended to May 1, 2008.  (R. 46).  She was last insured for DIB purposes on December 31, 2008.  (R. 22).

Plaintiff was initially denied benefits on February 12, 2010.  (R. 80-89).  A hearing was then held before ALJ James J. Pileggi on May 31, 2011.  Plaintiff was represented by counsel and testified at the hearing, as did Patricia J. Murphy, an impartial vocational expert ("VE").  (R. 22-37).  On June 23, 2011, the ALJ rendered a decision that was unfavorable to Plaintiff, having found that she retained the ability to perform a limited range of light and sedentary work and, therefore, was not "disabled" within the meaning of the Act.  (R. 22-37).  Plaintiff filed a request for review of the ALJ's decision with the Appeals Council, which was denied on September 24, 2012, thereby making the decision of the ALJ the final decision of the Commissioner.  (R. 1-3).

Plaintiff filed her Complaint in this Court on November 9, 2012.  (ECF No. 2).  Defendant filed her Answer on January 17, 2013.  (ECF No. 4).  Cross motions for summary judgment then followed.  (ECF. Nos. 9, 11).  In her motion, Plaintiff contends that the ALJ erred in failing to accord controlling weight to the opinion of one of Plaintiff's treating physicians.  For her part, the Commissioner contends that the ALJ's decision was supported by substantial evidence and should not be disturbed.

---

[2]     Citations to ECF Nos. 5–5-13, the Record, *hereinafter*, "R. __."

**III.    Factual Background**

Plaintiff was born on February 28, 1975.  (R. 124).  She was thirty-six (36) years old when her administrative hearing was held and thirty-three (33) years old when her alleged disability set in.  (R. 46, 48).  She is, therefore, classified as a "younger person" under the Act. *See* 20 C.F.R. §§ 404.1563 and 416.963.  She has a graduate equivalent degree ("G.E.D.") and past relevant work experience as a data entry clerk.  (R. 48-49).  The ALJ found that she has not engaged in substantial gainful activity since her alleged disability onset date.  (R. 24).  She is married and has three children, who were ages sixteen (16), fifteen (15) and thirteen (13) when the hearing was held.  (R. 48).  At the time of the hearing, each of Plaintiff's children lived at home with her and her husband.  (R. 48).

**A.    Treatment Notes of Plaintiff's Primary Care Physician**

Plaintiff's primary care physician throughout the relevant time period was Bernie Simons, M.D.  (R. 287-318).  Dr. Simons' records from 2006 to 2011 reflect that he treated Plaintiff several times a year for a variety of ailments, including, *inter alia*, chronic back and pelvic pain, anxiety, congestion, and ear pain.  On June 7, 2006, Plaintiff presented to Dr. Simons' office complaining of trouble hearing and sore throat/congestion.  (R. 305).  She also complained of generalized pain and panic attacks. (R. 305).  Dr. Simons diagnosed Plaintiff with an upper respiratory infection ("URI") and noted that she also suffered from interstitial cystitis with endometriosis.  (R. 305).  He refilled her prescription for Xanax and prescribed her medication for her URI.  (R. 306).

In October 2006, Plaintiff returned to Dr. Simons' office still experiencing the lingering effects of the URI.  (R. 302).  She also reported having increased anxiety, and Dr. Simons noted that "[i]t sounds like she is having true panic attacks."  (R. 302).  As a result, Dr. Simons

increased Plaintiff's dosage of Xanax and started her on Cymbalta and Prilosec. (R. 302). He also took note that Plaintiff suffered from Barrett's esophagus and abnormal weight gain. (R. 302).

Dr. Simons' treatment notes from the following year reveal a similar pattern of complaints and treatment. (R. 295-300). Between April 2007 and December 2007, Plaintiff presented to Dr. Simons on several occasions, each time complaining of a combination of achiness and pain in various parts of her body, coughing, congestion, pain in her ear, and allergies. (R. 295-300). Throughout this period, Dr. Simons maintained Plaintiff on a regimen of Xanax, Prilosec, and Lorcet. (R. 295-300). He also prescribed Claritin to manage Plaintiff's allergies. (R. 298).

Plaintiff returned to Dr. Simons' office three times in 2009. (R. 287-92). On January 6, 2009, she appeared complaining of problems related to her endometriosis. (R. 292). Specifically, Plaintiff reported that a recent CT scan revealed that her endometriosis had returned and that her physician, Dr. Eskendri, wanted to perform surgery, but the surgery had to be postponed. (R. 292). Plaintiff felt that the endometriosis was to blame for her back pain. (R. 292). As a result, Dr. Simons re-filled her medications and advised her to do back exercises. (R. 291). Furthermore, during a pair of visits in September 2009 and October 2009, Plaintiff was experiencing congestion, ear pain, headache, fatigue, back pain, and dizziness. (R. 287-89).

Plaintiff made several visits to Dr. Simons in 2010, raising complaints similar to those she had made in the past related to her back and ear pain. (R. 438-50). For example, in May 2010, Dr. Simons noted that "[Plaintiff] has been having terrible trouble with her back . . . She notes the pain is severe and it radiates around that left side . . . She is having trouble walking. She walks hunched over." (R. 369). After examining Plaintiff, Dr. Simons assessed her with

"[l]ower back pain with radicular symptoms down that right foot" and ordered her to undergo physical therapy three times a week for three weeks. (R. 369). Plaintiff followed up with Dr. Simons on July 14, 2010, complaining of problems with her ears in addition to her back pain. (R. 366). According to Dr. Simons, Plaintiff's ear trouble was probably attributable to the fact that she had two dogs in the house and continues to smoke, which kept her congested. (R. 366). Moreover, with respect to Plaintiff's back pain, Dr. Simons noted that an MRI "didn't show anything significant." (R. 447). He further noted that Plaintiff never attended her prescribed physical therapy because her grandmother was dying, which forced her to frequently visit her in the hospital. (R. 366). Several months later, Dr. Simons reported that Plaintiff had presented to the emergency room with "excruciating epigastric pain." (R. 363). He further noted that X-rays revealed a partial bowel obstruction, while a CT scan revealed a fatty liver. (R. 363). His assessment was abdominal pain (rule out colitis, gallbladder disease, and peptic ulcer disease); mild fatty liver of the falciform ligament; and nausea and vomiting. (R. 362). During a December 10, 2010, visit, Plaintiff reported that she believed her constant aches and pains were the result of fibromyalgia. (R. 360). She asked to be referred to a specialist, and Dr. Simons obliged. (R. 438).

**B. Treatment Notes of Plaintiff's Rheumatologist Regarding Fibromyalgia**

In early 2011, Plaintiff was seen by rheumatologist Charles L. Pucevich, M.D., with regard to her complaint of fibromyalgia. (R. 429). According to Dr. Pucevich's notes, Plaintiff informed him that she had experienced generalized pain and discomfort for approximately two (2) years, which started in her neck and upper shoulders and eventually spread throughout her body. (R. 429). Dr. Pucevich examined Plaintiff and determined that she had several tender points throughout her body, which are indicative of fibromyalgia. (R. 430). Thus, he concluded

that "[Plaintiff] certainly appears to have fibromyalgia." (R. 427). In order to manage Plaintiff's symptoms, Dr. Pucevich placed her on the anti-convulsant/pain medication Neurontin. (R. 427). He also ordered blood tests, the results of which were normal, and noted that if Plaintiff's symptoms did not improve, he "might decide to inject 1-2 trigger points the next time I see her." (R. 423-27).

Plaintiff returned to Dr. Pucevich on April 20, 2011, and she explained that the Neurontin had helped somewhat. (R. 423). Dr. Pucevich noted that Plaintiff had also recently started to take another pain medication, Savella. (R. 423). She was, however, still experiencing fibromyalgia-related symptoms. (R. 423). Upon examination, Dr. Pucevich noted that "[s]he has a lot of trigger points." (R. 423). As a result, he decided to increase her dosage of Nuerontin, and asked her to follow-up in five weeks to inform him how she felt on the combination of Nuerontin and Savella. (R. 423).

Dr. Pucevich also completed a residual functional capacity ("RFC") evaluation dated June 14, 2011, in which he opined that Plaintiff could sit for no more than one (1) hour at a time and no more than four (4) hours total in an eight (8) hour workday. (R. 463). Similarly, Dr. Pucevich indicated that Plaintiff could not stand or walk for more than one (1) hour in an eight (8) hour workday. (R. 463). Dr. Pucevich also noted limitations in Plaintiff's abilities to lift and carry, push and pull with her arms, push and pull with her legs, bend, and reach. (R. 463). Finally, he remarked that Plaintiff had tenderness in several bilateral trigger points. (R. 463).

### C. Other Medical Evidence

Plaintiff underwent a psychological evaluation with Julie Uran, Ph.D., in January 2010. (R. 319-28). Plaintiff reported at this time that she did not believe she could sustain a job because of pain and depression. (R. 319). Upon examination, Dr. Uran determined that

Plaintiff's mood and affect were appropriate, her thought process was normal, her memory was good, and her social judgment was appropriate. (R. 321). Furthermore, in Dr. Uran's view, Plaintiff appeared to be fully alert and displayed good insight. (R. 321). Based on her review of Plaintiff's medical records and her own examination, Dr. Uran diagnosed Plaintiff with major depressive disorder (recurrent) and anxiety disorder NOS. (R. 322). She also assessed Plaintiff with a Global Assessment of Functioning ("GAF")[3] score of 55. (R. 322).

Dr. Uran also completed an RFC assessment, in which she indicated that Plaintiff had no limitations in understanding and remembering short, simple instructions and in carrying out short, simple instructions; "moderate" limitations in understanding and remembering detailed instructions and in carrying out detailed instructions; and "slight" limitations in making judgments on simple, work-related decisions. (R. 325). In addition, Dr. Uran noted no limitations with respect to interacting appropriately with supervisors; "slight" limitations with respect to interacting appropriately with the public, interacting appropriately with co-workers, and responding appropriately to changes in a routine work setting; and "moderate" limitations with respect to responding appropriately to work pressures in a usual work setting. (R. 325).

A state agency psychologist, John Rohar, Ph.D., reviewed the medical and psychological evidence with respect to Plaintiff's claim, including Dr. Uran's report, on January 29, 2010. (R. 333). Dr. Rohar concluded that Plaintiff was not significantly limited in her ability to engage in most mental activities. (R. 333). Furthermore, he indicated that Plaintiff had no "marked" impairments in her capabilities. (R. 333-34). Therefore, he concluded that Plaintiff was "able to

---

[3] A patient's GAF score measures, on a scale of 0-100, the overall effect of her mental health disorder on her ability to function in activities of daily living, as well as socially and occupationally. *See* Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Revised 34 (4th ed. Text Revision, American Psychiatric Association 2000).

meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments," *i.e.*, that she was not disabled under the Act. (R. 335).

On February 12, 2010, Juan B. Mari-Mayans, M.D., completed a physical RFC assessment. (R. 351). Dr. Mari-Mayans noted that Plaintiff suffered from interstitial cystitis and Barrett's esophagus. (R. 351). He also found Plaintiff's statements with regard to the disabling effects of her impairment to be partially credible. (R. 356). Nevertheless, he opined that Plaintiff maintained the RFC to perform a full range of light work. (R. 356).

Upon referral from Dr. Simons, Plaintiff saw gynecologist Keith Wharton, M.D., three times in July 2010 for her complaints of pelvic pain. (R. 388-402). During Plaintiff's first visit, on July 16, 2010, Dr. Wharton indicated in his notes that Plaintiff "has a long history of endometriosis w[ith] multiple surgeries. She is now in constant pain, and has pain w[ith] sex." (R. 398). Dr. Wharton diagnosed Plaintiff with acute endometriosis, acute pelvic pain, acute cystitis, and an acute vulvar lesion. (R. 398). Plaintiff followed up with Dr. Wharton on July 20, 2010, at which time Dr. Wharton diagnosed her with vulvar lesion (chronic uncontrolled) and vulvar ulcer (acute). (R. 393). Finally, on July 27, 2010, Plaintiff visited Dr. Wharton for back pain. (R. 388). Dr. Wharton noted that Plaintiff had an MRI showing bulging discs and arthritis and diagnosed her with acute interstitial cystitis, acute lumbago, and acute menopausal symptoms. (R. 391).

### D. Administrative Hearing

At her hearing before the ALJ, Plaintiff testified that at the time of her alleged onset date, the principal problems preventing her from working stemmed from her endometriosis and interstitial cystitis. (R. 53). By the time of the hearing, however, she pinpointed fibromyalgia as the main problem. (R. 52). Although she was not formally diagnosed with fibromyalgia until

2010-11, she described having the type of generalized pain typically associated with the condition since approximately 2009. (R. 62). She described experiencing constant pain throughout her entire body. (R. 52-53). The pain could be severe at times, and although her pain medications helped, it did not completely eliminate the pain. (R. 54).

Plaintiff explained that she could only walk for about one-hundred (100) feet before having to sit and rest and that she required the assistance of her husband and children to get around. (R. 50, 54). She also stated that she could stand for only about fifteen (15) minutes at a time before having to sit down and sit for only about fifteen (15) to twenty (20) minutes before having to stand up and move around. (R. 54-55). When asked if she could bend down to pick up a towel, coin or piece of paper from the floor, she replied that she could but that "it would severely hurt." (R. 55). She also explained that she tried to avoid lifting things. (R. 56).

In addition to pain and limitations associated with fibromyalgia, Plaintiff described a number of other ailments. (R. 56-58). She testified that she sometimes experienced incontinence as a result of her cystitis and suffered pain when going to the restroom, which she does approximately two (2) to three (3) times an hour. (R. 57, 63, 64). She further testified that her gastrointestinal problems (Barrett's esophagus, diverticulitis, and hiatal hernia) caused her constant pain in her stomach. (R. 59-60). She also testified to having headaches two (2) to three (3) times a week and, as a side effect of taking Neurontin, often experienced dizziness and blurred vision. (R. 64-65).

With respect to her ability to engage in daily activities, she testified that she could bathe and dress herself but sometimes needed help from her children. (R. 62). She also testified that her brother and children typically helped her with household chores such as preparing meals, washing dishes, and doing laundry. (R. 62). Furthermore, although she testified that she could

drive, she told the ALJ that she no longer went out to buy groceries, to the movies, to restaurants, or to socialize. (R. 49, 62-63). She had not done so for more than one (1) year. (R. 63).

After Plaintiff testified, the ALJ asked the VE whether a hypothetical person of Plaintiff's age, educational background, and work experience could obtain full-time work existing in significant numbers in the national economy, if limited by the following restrictions: she must work in close proximity to restrooms; she would not be able to work in a loud-noise environment; she would not be able to do telephone work where should would have to be talking for most of the day or listening; she would not be able to work on unprotected heights or engage in climbing as a significant aspect of her job; she would not be able to work in a highly stimulative environment; she would not be able to work around pulmonary irritations; and she would not be able to engage in work that required constant gripping or grasping. (R. 72). In response, the vocational expert testified that such a person would be able to work as a "cafeteria cashier," with 509,000 jobs available in the national economy; a "movie theater attendant," with 45,000 jobs available; or a "parking lot cashier," with 67,000 jobs available. (R. 73).

The ALJ then modified the question to restrict the hypothetical person to sedentary work. (R. 73). The vocational expert responded that the hypothetical person would still be capable of performing three jobs that exist in significant numbers in the national economy: "addresser," with 71,000 such jobs available; "document preparer," with 96,000 available; and "table worker," with 32,000 available. (R. 73). According to the VE, all of these jobs could also be done with a sit-stand option. (R. 73). However, in such case, the number of jobs available in the national economy would be reduced by approximately one-third. (R. 73).

### III. Legal Analysis

#### A. <u>Standard of Review</u>

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g)/1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g); *see Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). It consists of more than a scintilla of evidence but less than a preponderance. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal quotation marks omitted); 42 U.S.C. § 423 (d)(1).

This may be done in two ways:

(1)     by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1.  See *Heckler v. Campbell*, 461 U.S. 458, 460 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or,

(2)     in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ."  *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job.  *See Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503.  Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given the claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

Where a claimant has multiple impairments that may not individually reach the level of severity necessary to qualify a single impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment.  *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 502 (3d Cir. 2010); *see also* 42 U.S.C. § 423(d)(2)(C) (providing that "in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

**B.      The ALJ's Decision**

In this case, the ALJ determined at the second step of the sequential evaluation that Plaintiff had the following severe impairments: hearing loss, interstitial cystitis, diverticulitis, Barrett's esophagus, hiatal hernia, endometriosis, and obesity.  (R. 24).  By contrast, the ALJ found that Plaintiff's medically determinable mental impairments of major depressive disorder and anxiety disorder were non-severe.  (R. 24).  At the third step of the sequential analysis, the ALJ concluded that none of Plaintiff's severe impairments met or equaled any of the impairments listed in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1.  (R. 26-27).  Based on all of the medical evidence of record, the ALJ went on to conclude that Plaintiff retained the RFC to perform light work subject to the limitations described in his hypothetical question to the VE.  (R. 27).

In reaching that decision, the ALJ found that Plaintiff's statements with respect to the severity of her alleged symptoms were "not credible to the extent that they are inconsistent with the above [RFC] assessment."  (R. 28).  He also concluded that Plaintiff's limited work history diminished her creditability.  (R. 32).

With respect to the objective medical evidence, the ALJ opined that "[Plaintiff's] limited medical history is inconsistent with and unsupportive of [her] disability."  (R. 28).  He further explained that Plaintiff's "course of medical treatment and the use of medication in this case are not consistent with disabling impairments."  (R. 32).  Specifically, although Plaintiff was on medication, the ALJ noted that she was never recommended for surgery and received no formal mental health treatment.  (R. 33).  Moreover, the ALJ explained that Plaintiff retained the ability to engage in a number of activities of daily living, thereby further undermining her claim of being disabled.  (R. 32).

Turning to the opinion evidence, the ALJ essentially discounted the opinion of Plaintiff's treating rheumatologist, Dr. Pucevich, with respect to Plaintiff's severe work-related limitations because it was not supported by the medical evidence and was also purportedly inconsistent with Dr. Pucevich's own examination of Plaintiff. (R. 33). Conversely, the ALJ accorded some weight to the opinions of Drs. Uran, Rohar, and Mari-Mayans – none of whom were treating physicians – because they were generally consistent with the record. (R. 33-34).

At the fourth step of the sequential evaluation, the ALJ, guided by the testimony of the VE, found that Plaintiff retained the ability to perform her past relevant work as a data entry clerk. (R. 34). Furthermore, the ALJ explained that even if Plaintiff's work as a data entry clerk did not constitute past relevant work, Plaintiff could still perform other jobs that exist in significant numbers in the national economy: "cafeteria cashier," "movie theater attendant," and "parking lot cashier." (R. 35). The ALJ held, therefore, that Plaintiff was not disabled within the meaning of the Act. (R. 36).

## C.     Discussion

Plaintiff's sole point of contention with respect to the ALJ's decision is that he should have given controlling weight to the opinion of her rheumatologist, Dr. Pucevich, as to the effect of fibromyalgia on her ability to work. Pl.'s Br. in Supp. of Mot. for Summ. J. at 18 (ECF. No. 10). Not surprisingly, Defendant counters that substantial evidence supported the ALJ's decision. She points out that diagnostic tests over several years revealed only minimal impairments and that Plaintiff was treated rather conservatively in light of her allegations of disability. Def.'s Br. in Supp. of Mot. for Summ. J. at 10-11 (ECF No. 12). Furthermore, she argues that the ALJ was not required to accept Dr. Pucevich's findings because they were unsupported by the objective medical evidence. *Id.* at 12 (ECF No. 12).

As Plaintiff correctly argues, a treating physician's opinions are generally entitled to great weight. *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). This is particularly true where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Morales*, 225 F.3d at 317; *see also* 20 C.F.R. § 416.927(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). In such case, only a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright or accord it less weight. *Brownawell*, 554 F.3d at 355.

The so-called "treating physician doctrine" takes on special significance when a claimant alleges disability based on fibromyalgia. *See Henderson v. Astrue*, 887 F. Supp. 2d 617, 635 (W.D. Pa. 2012) (quoting *Perl v. Barnhart*, No. 03-4580, 2005 WL 579879, at *3 (E.D. Pa. Mar. 10, 2005)). Fibromyalgia is a condition characterized by diffuse pain throughout the body over an extended period of time, and tender points[4] in "joints, muscles, tendons and other soft tissues." *Smith v. Comm'r of Soc. Sec.*, No. 09-182, 2009 WL 2762687, at *1 n.7 (W.D. Pa. Aug. 31, 2009). People with fibromyalgia also often experience a combination of fatigue, trouble sleeping, headaches, morning stiffness, numbness in the hands and feet, depression, and anxiety. *Id.* The courts of appeals are in general agreement that those maladies, taken together, "can

---

[4] Tender points are points on the body where fibromyalgia sufferers feel pain when slight pressure is applied. *Lintz v. Astrue*, No. 08-424, 2009 WL 1310646, at *7 (W.D. Pa. May 11, 2009) (internal citation omitted).

produce functional limitations that would be disabling." *Lintz v. Astrue*, No. 08-424, 2009 WL 1310646, at *9 (W.D. Pa. May 11, 2009) (collecting cases).

However, with its specific cause unknown, fibromyalgia has led to significant confusion in the medical community. *Id.* Likewise, because of the difficulty doctors have with diagnosing the condition, it presents several unique challenges to an ALJ in making a disability determination. *See Henderson*, 887 F. Supp. 2d at 636; *Smith,* 2009 WL 2762687, at *1 n.7 (internal citation omitted). Patients sometimes display normal muscle strength and have a full range of motion, and, therefore, lab tests are incapable of confirming whether a person has the condition. *Lintz*, 2009 WL 1310646, (collecting cases). Because of the ineffectiveness of objective testing in detecting the condition, it is diagnosed largely on the basis of a patient's subjective complaints of pain. *Id.* (quoting *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004)). A diagnosis also requires a finding of tenderness in eleven (11) of eighteen (18) tender points throughout a patient's body. *Smith*, 2009 WL 2762687, at *1 n.7.

In view of those principles, the Court finds several errors in the ALJ's determination that Plaintiff was not disabled under the Act. First, the ALJ failed to properly address Dr. Pucevich's opinion as to the disabling effects of Plaintiff's fibromyalgia. In reaching his decision, the ALJ observed that "Dr. Pucevich essentially found [Plaintiff] to be disabled as he determined [she] was limited to sitting for 4 hours in an 8-hour workday, standing for 1 hour in an 8-hour workday, walking for 1 hour in an 8-hour workday, lifting and carrying up to 10 pounds occasionally, no pushing and pulling of arm controls, occasional bending and reaching, no squatting, crawling or climbing, no exposure to unprotected height or moving machinery, moderate exposure to changes in temperature and humidity, dust, fumes and gasses, and mild exposure to driving automotive equipment." (R. 32). While the ALJ recognized that Dr.

16

Pucevich's opinion, as a treating physician, "would ordinarily be entitled to great weight[,]" he concluded that "his opinion is not supported by [Plaintiff's] medical record including objective testing, which as discussed above has been relatively normal. Moreover, his finding of such significant limitations is inconsistent with his own examinations of the claimant, which did not reveal significant objective abnormalities." (R. 33) (emphasis added). Thus, the ALJ chose to discount it. (R. 33).

By focusing on the lack of "objective testing" and "objective abnormalities," the ALJ ignored that this type of evidence "is of little relevance in reviewing a claim of disability based on chronic pain and fatigue from fibromyalgia . . . ." *Smith*, 2009 WL 2762687, at *4. Instead, a diagnosis is based on the existence of tenderness in the various tender points and an evaluation of the patient's subjective complaints of pain, discomfort, and other symptoms indicative of the condition. Therefore, contrary to the ALJ's conclusion, Dr. Pucevich's examination – which may not have revealed "objective abnormalities" but did reveal diffuse pain over a prolonged period and "a lot of trigger points" – was not inconsistent with his RFC finding. It was completely in line with what one would expect to find when dealing with a vexing condition like fibromyalgia.

Second, on at least two occasions in his decision, the ALJ stated that his finding as to Plaintiff's disability was supported by the fact that Plaintiff had not received very aggressive medical treatment. (R. 32, 33). For example, he pointed out that no one recommended Plaintiff to have surgery. (R. 32). However, it is not clear that aggressive treatment such as surgery is appropriate "for a patient suffering from chronic fibromyalgia pain and fatigue." *Smith*, 2009 WL 2762687, at *4. Instead, the recommended "[t]reatments for fibromyalgia include cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications

such as muscle relaxants, antidepressants, and anti-inflammatories." *Brosnahan v. Barnhart*, 336

F.3d 671, 672 n.1 (8th Cir. 2003). Patients also often undergo physical therapy and are

encouraged to do aerobic exercises. *See Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2009).

Here, Plaintiff's course of treatment was entirely consistent with those recommendations: she

was prescribed the anti-convulsant/pain medication Neurontin and the pain medication Savella,

and she was also ordered to attend physical therapy, which she was apparently unable to attend.[5]

(R. 366, 369, 427). Furthermore, Dr. Pucevich considered giving her injections of a nonsteroidal

anti-inflammatory agent ("NSAIA"), but he was wary of doing so because of her medical

history. (R. 427). Thus, contrary to the ALJ's conclusion, the absence of evidence of surgery or

other more aggressive forms of medical treatment does not constitute substantial evidence

supporting his decision. *See Smith*, 2009 WL 2762687, at *4.

The ALJ also erred by failing to properly address the clinical findings of Dr. Simons,

which were compiled over the course of nearly six (6) years of office visits. Had the ALJ

properly considered this history of treatment, he would have been forced to recognize that the

record was replete with observations of fibromyalgia-related symptoms that could be construed

as consistent with Dr. Pucevich's ultimate finding with respect to Plaintiff's RFC. Starting in

2006, for example, Plaintiff presented to Dr. Simons with complaints of, *inter alia*, diffuse pain,

dizziness, anxiety, headaches, and trouble sleeping. Dr. Simons prescribed her with medications

and exercises/therapy in hopes of alleviating these symptoms. Eventually, Dr. Pucevich assessed

Plaintiff with fibromyalgia. (R. 438). Granted, some of these alleged symptoms could have

been the result of Plaintiff's various other medical conditions. Nevertheless, Plaintiff's relatively

---

[5] The Court recognizes that Plaintiff was ordered to do back exercises and attend physical therapy before she was actually diagnosed with fibromyalgia. However, the pain she was experiencing at the time was consistent with her later diagnosis, and Dr. Simons never specified for which of her many alleged conditions she was being prescribed the treatments.

prolonged pattern of complaints and treatment for diffuse, lingering aches and pain could have also been the result of her then-undiagnosed fibromyalgia, which often takes significant time to diagnose. *See Kuhn v. Prudential Ins. of America*, 551 F. Supp. 2d 413, 427 (E.D. Pa. 2008) ("It is often difficult to diagnose fibromyalgia, and often people with fibromyalgia have undergone many tests and have seen many different specialists while in search of an answer.") (Internal quotation marks omitted). In the least, the ALJ should have thoroughly explored the nature of Plaintiff's fibromyalgia and, in light of that, explained how her long history of treatment with Dr. Simons was either consistent or inconsistent with Dr. Pucevich's RFC assessment. He erred in failing to do so. Therefore, on remand, Dr. Pucevich's RFC evaluation should be considered in the context of Dr. Simons' assessments during Plaintiff's many office visits.

Finally, the Court finds that the ALJ erred in assessing Plaintiff's credibility. Specifically, the ALJ found that "in spite of her impairments, [Plaintiff] prepares meals, completes household chores with some help, drives, shops, reads, watches television, and is independent in personal care." (R. 32). He then opined that these "numerous activities of daily living are inconsistent with [Plaintiff's] allegations of being disabled. It would be expected that [Plaintiff] would be less active if her allegations were true." (R. 32). The hearing transcript reveals, however, that the ALJ mischaracterized Plaintiff's ability to perform daily activities. Although Plaintiff did testify that she could bathe and get dressed, she also explained that her daughter sometimes assists her with those tasks. (R. 62). Moreover, when asked whether she could perform routine household chores such as preparing meals, washing dishes, and doing laundry, Plaintiff responded, "The laundry my brother does. I can like wipe off countertops and try to load up the dishwasher but the kids help me with everything." (R. 62). She also testified that she had not gone grocery shopping, to a restaurant, to the movies, or to socialize in more than a year. (R. 62-

63).  As for her ability to drive, Plaintiff stated she avoided unnecessary driving and could not drive while on her medications.  (R. 49).  Similarly, she said that she required help from family members to get around.  (R. 49).

Although Plaintiff may have retained the ability to engage in minimal activities around her house, performing such activities did not necessarily undermine her credibility with respect to her testimony about the disabling effects of her fibromyalgia.  *See Johnson*, 597 F.3d at 412 (explaining that performing basic household such as chores and driving "[is] not necessarily inconsistent" with a finding of disability based on fibromyalgia); *Lintz*, 2009 WL 1310646, at *10 (explaining that, in the context of a fibromyalgia claim, performing "minor household chores, and once a week socializing with friends does not undermine Plaintiff's credibility").  Thus, further assessment of Plaintiff's credibility is required on remand.

**VI.     Conclusion**

Under the Social Security regulations, a federal district court, upon review of a decision of the Commissioner denying benefits, has three options.  It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration.  42 U.S.C. § 405(g) (sentence four).  In light of an objective review of all of the record evidence, the Court finds that the ALJ failed to support her opinion with substantial evidence and that the decision must be remanded to the ALJ for further consideration consistent with this opinion.  The Commissioner's decision in the present case may, however, ultimately be correct and nothing in this Memorandum Opinion should be taken to suggest that the Court has presently concluded otherwise.

 For these reasons, Plaintiff's Motion for Summary Judgment will be **GRANTED** insofar as it requests a remand for further consideration; Defendant's Motion for Summary Judgment

will be **DENIED**; and the decision of the ALJ will be **VACATED** and **REMANDED** for further consideration not inconsistent with this Opinion.  On remand, the ALJ is instructed to consider all of the medical evidence of record, including the opinion of Plaintiff's treating rheumatologist, Dr. Pucevich and Plaintiff's long history of treatment with Dr. Simons for a variety of fibromyalgia-related symptoms, in a manner that is consistent with current state of medical understanding of fibromyalgia, which cannot be diagnosed through objective testing.  The ALJ is further instructed to reconsider the interplay between Plaintiff's actual daily activities, her claim of disability based on fibromyalgia, and her credibility.

An appropriate Order follows.


McVerry, J.

| | |
|---|---|
| KELLY EVONNE AMELIA DOYCHAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 02:12-cv-1645 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

**AND NOW**, this 4th day of September, 2013, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1.    Plaintiff's Motion for Summary Judgment (ECF No. 9) is **GRANTED,** insofar as

it requests a remand consistent with the foregoing memorandum opinion and

**REMAND** is **ORDERED**.

2.    Defendant's Motion for Summary Judgment (ECF No. 11) is **DENIED**.

3.    The Clerk will docket this case as closed.


BY THE COURT:


s/ Terrence F. McVerry
United States District Judge


cc:    Stanley E. Hilton, Esq.
       Email: GO2166@AOL.com

       Michael Colville, Esq.
       Email: Michael.colville@usdoj.gov